Redacted Version

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | |
|---|---|
| L-3 SERVICES, INC., Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. | Civil Action No. ________ **FILED UNDER SEAL REQUEST FOR PROTECTIVE ORDER PENDING** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTIONS FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF**

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001-4412
(202) 639-6893 Telephone
(202) 637-6365 Protected Facsimile

Counsel for Plaintiff
L-3 Services, Inc.

Of Counsel:

Kevin C. Dwyer
Edward Jackson
Daniel E. Chudd
Damien C. Specht

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington D.C. 20001-4412

## TABLE OF CONTENTS


I. PRELIMINARY STATEMENT ........................................ 1

II. STATEMENT OF THE QUESTIONS ........................................ 2

III. STATEMENT OF THE CASE ........................................ 3

A. The Parties and the Contract Awardee ........................................ 3

B. The PMSS2 Solicitation ........................................ 3

C. Evaluation of Proposals. ........................................ 6

1. Factor 1 – Corporate Capability ........................................ 8

2. Factor 2 - Performance Risk. ........................................ 9

3. Factor 3 - Technical/Management. ........................................ 9

4. Factor 5 - Small Business Participation. ........................................ 10

5. Summary of Evaluations and Prices. ........................................ 10

D. The SSA's Source Selection Decision. ........................................ 11

E. Award and Debriefing ........................................ 12

F. The GAO Protest ........................................ 13

IV. ARGUMENT ........................................ 13

A. Jurisdiction and Standard of Review ........................................ 13

B. L-3 Likely Will Prevail On the Merits ........................................ 15

1. The Army's Best Value Tradeoff Was Inconsistent with the RFP's [redacted] and Reflected Disparate Treatment of L-3. ........................................ 15

2. The Army's Award Decisions [redacted] ........................................ 20

a. The SSA's Best Value Tradeoff Between L-3 and Wyle Does Not [redacted] and Reflects Disparate Treatment. ........................................ 23

(i) The SSA [redacted] Under Factor 1 ........................................ 24

(ii) The SSA improperly [redacted] under Factor 3. ........................................ 29

(iii) The SSA [redacted] under Factor 5. ........................................ 31

(iv) The SSA's [redacted] underlies the unreasonable conclusion that Wyle offered better value than L-3. ....32

b. The SSA's Best Value Tradeoff Between L-3 and [redacted] and Reflects Disparate Treatment. ....33

(i) The SSA [redacted] under Factor 1. ....35

(ii) The SSA improperly [redacted] when assessing Factor 2. ....38

(iii) The SSA's mistaken analysis continued under Factor 3. ....39

(iv) Under Factor 5, [redacted] ....40

(v) The SSA's [redacted] underlies the unreasonable conclusion that [redacted] ....41

c. The SSA Failed to Perform a Meaningful Review of L-3's Proposal. ....43

3. The Army's Evaluation of L-3 and the Awardees Was Arbitrary and Capricious, and Otherwise Contrary to Procurement Law. ....45

a. L-3 Should Have [redacted] ....46

b. The Army's Evaluations of [redacted] under the Small Business Participation Factor Resulted in Inflated Ratings. ....47

(i) [redacted] ....47

(ii) [redacted] ....49

c. The Army's Failure [redacted] Is Fatal to the Army's Technical Evaluation. ....51

(i) [redacted] To Perform A Meaningful Evaluation Under The RFP's Technical Criteria. ....51

(ii) The Army's Failure [redacted] ....56

d. The Army's Technical Evaluation Improperly Considered Subcontractors, Notwithstanding the RFP's Express Limitation to Offerors." ....57

e. The Army Evaluated and Relied on [redacted] .............61

C. L-3 Will Suffer Irreparable Harm. .............66

D. Any Purported Harm to the Army is Minimal. .............67

E. Injunctive Relief is in the Public's Best Interests. .............68

F. Security. .............69

V. CONCLUSION. .............69

## TABLE OF AUTHORITIES

**CASES** **Page(s)**

*American Fed'n of Gov't Employees v. United States*,
258 F.3d 1294 (Fed. Cir. 2001)....13

*American Lawn Service, Inc.*,
B-267715, Dec. 20, 1995, 95-2 CPD ¶ 278....16

*BAE Technical Servs., Inc.*,
B-296699, Oct. 5, 2005, 2005 CPD ¶ 91....19, 27, 30, 39

*Banknote Corp. of Am. v. United States*,
365 F.3d 1345 (Fed. Cir. 2004)....13

*BLH, Inc. v. United States*,
13 Cl.Ct. 265 (1987)....61

*Blue & Gold Fleet, L.P. v. United States*,
492 F.3d 1308 (Fed. Cir. 2007)....15

*Blue Rock Structures, Inc.*,
B-293134, Feb. 6, 2004, 2004 CPD ¶ 63....17, 18

*Dept. of Energy–Recons.*,
B-203937, Jan. 19, 1982, 82-1 CPD ¶ 41....56

*Dewberry & Davis*,
B-247116, May 5, 1992, 92-1 CPD ¶421....16, 18

*DLI Eng'g Corp.–Recons.*,
B-218335, Oct. 28, 1985, 85-2 CPD ¶ 468....17, 42

*Dyncorp. Int'l. LLC*,
B-289863, May 13, 2002, 2002 CPD ¶ 83....16

*Emerald Coast Finest Produce Co. Inc. v. United States*,
75 Fed. Cl. 549 (2007)....16

*EPSCO, Inc.*,
B-183816, Nov. 21, 1975, 75-2 CPD ¶ 338....17

*Gemmo Implanti SPA*,
B-290427, 2002 CPD ¶ 146....62, 65

*Hamilton Sundstrand Power Sys. v. United States*,
75 Fed.Cl. 512 (2007) .......... 19

*Hawaiian Dredging Constr. Co. v. United States*,
59 Fed. Cl. 305 (2004) .......... 67

*Hospital Klean of Texas*, .......... 68
65 Fed. C1. 618, 624 (2005)

*Hot Shot Express*,
B-290482, 2002 CPD ¶ 139 .......... 62

*Impresa Construzioni Geom. Domenico Garufi v. United States*,
238 F.3d 1324 (Fed. Cir. 2001) .......... 14

*Information Sciences Corp. v. United States*,
73 Fed.Cl. 70 (2006) .......... 16, 66

*Isometrics, Inc. v. United States*,
5 Cl. Ct. 420 (1984) .......... 18

*Isratex, Inc. v. United States*,
25 Cl.Ct. 223 (1992) .......... 15

*Johnson Controls World Services, Inc. v. United States*,
44 Fed.Cl. 334 (1999) .......... 61

*Keeton Corrs., Inc. v. United States*,
59 Fed. Cl. 753 (2004) .......... 14

*Kempter-Rossman Int'l*,
B-220772, Feb. 4, 1986, 86-1 CPD ¶ 127 .......... 33

*Kentron Haw., Ltd. v. Warner*,
480 F.2d 1166 (D.C. Cir. 1973) .......... 14

*Lockheed Martin Info. Sys.*, Dec. 18, 2003, 2003 CPD ¶ 230 .......... 19, 20

*Lockheed Aeronautical Sys. Co.*,
B-252235.2, Aug. 4, 1993, 93-2 CPD ¶ 80 .......... 56

*Matrix Int'l Logistics Inc.*,
B-272388.2, Dec. 9, 1996, 97-2 CPD ¶ 89 .......... 35, 37, 44

*Met-Pro Corp.*,
B-250706.2, Mar. 24, 1993, 93-1 CPD ¶ 263 .......... 44

*Metcalf Const. Co. v. United States*,
53 Fed. Cl. 617 (2002) ....................68

*OTI America, Inc. v. United States*,
68 Fed. Cl. 646 (2005) ....................66

*Overstreet Elec. Co., Inc. v. United States*,
47 Fed. Cl. 728 (2000) ....................66

*Overton Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ....................14

*Parcel 49C Ltd. P'ship v. United States*,
31 F.3d 1147 (Fed. Cir. 1994) ....................68

*Perini/Jones*,
B-285906, 2002 CPD ¶ 68 ....................62

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004) ....................14, 66

*PGBA, LLC v. United States*,
57 Fed.Cl. 655 (2003) ....................66

*ProTech Corp.*,
B-294818, Dec. 30, 2004, 2005 CPD ¶ 73 ....................15, 23, 26, 27

*Seattle Sec. Servs. Inc. v. United States*,
45 Fed. Cl. 560 (2000) ....................67, 68

*Seedburo Equip. Co.*,
B-278569, Feb. 25, 1998, 98-1 CPD ¶ 65 ....................42

*Serco Inc. v. United States*,
81 Fed.Cl. 463 (2008) ....................44

*SOS Interpreting, Ltd.*,
B-293026, Jan. 20, 2004, 2005 CPD ¶ 26 ....................16

*Suddath Van Lines, Inc.*,
B-274285.2, May 19, 1997, 97-1 CPD ¶ 204 ....................42

*Symplicity Corp.*,
B-291902, April 29, 2003, 2003 CPD ¶ 89 ....................56, 58, 59

*Telemetrics, Inc.; Techniarts Engineering*, B-242957.7, Apr. 3, 1992, 92-2 CPD ¶ 168 ....................55

*The Austin Co.*, B-221863.2, June 20, 1986, 86-1 CPD ¶ 574 ....................44, 45

*The Faxon Co.*,
B-227835.3, Nov. 2, 1987, 87-2 CPD ¶ 425 .......... 15

*Transatlantic Lines LLC v. United States*,
68 Fed. Cl. 48 (2005) .......... 67

*University Research Co. v. United States*,
65 Fed. Cl. 500 (2005) .......... 67, 68

**STATUTES**

5 U.S.C. § 706 .......... 14

5 10 U.S.C. §§ 2305(a)(2)(A)(i)-(ii) .......... 15

10 U.S.C. § 2305(b)(1) .......... 15

28 U.S.C. § 1491 .......... 13, 14

31 U.S.C. § 3551 .......... 13

31 U.S.C. § 3551(2)(A) .......... 13

31 U.S.C. § 3553(d)(3) .......... 13

**OTHER AUTHORITIES**

48 C.F.R. § 33.104(c)(1) .......... 13

**EXHIBITS**

1 Solicitation ("RFP") (Excerpts) (Agency Record ("AR") Tab 4)[1]

2 SSA Final Briefing (AR Tab 84)

3 Debriefing Slides (AR Tab 94)

4 Price Factor Evaluation Report (Excerpts) (AR Tab 83)

5 Source Selection Decision Document (Redacted) (AR Tab 85)

6 SSEB Final Consensus Evaluation Documents - L-3 (AR Tab 79)

7 SSEB Final Consensus Evaluation Documents - Wyle (AR Tab 82)

8 Source Selection Plan (AR Tab 5)

9 SSEB Final Consensus Evaluation Documents - BAH (AR Tab 80)

10 Section J, Attachment 1, Master Labor Rate Table - SRA (AR Tab 90)

11 Contracting Officer's Statement (AR Tab 2)

12 L-3 FPR Volume III - Technical Management (Excerpts) (AR Tab 57)

13 BAH's FPR, Volume III - Technical Management (Excerpts) (AR Tab 63)

14 SRA's Proposal Volume III - Technical Management (AR Tab 20)

15 Wyle's FPR , Volume III - Technical Management (Excerpts) (AR Tab 75)

16 Section J, Attachment 1, Master Labor Rate Table - BAH (AR Tab 88)

17 Section J, Attachment 1, Master Labor Rate Table - Wyle (AR Tab 92)

18 L-3 FPR Volume IV - Price (Excerpts) (AR Tab 58)

19 SSEB Final Consensus Evaluation Documents - SRA (AR Tab 81)

20 SRA's FPR, Volume I - Corporate Capability (AR Tab 67)

21 SRA's FPR, Volume III - Technical Management (AR Tab 69)

---

[1] Citations to the Agency Record ("AR") refer to the record issued to L-3 on May 14, 2008 as part of GAO Bid Protest B-400055.

22 Wyle's FPR, Volume I - Corporate Capability (Excerpts) (AR Tab 73)

23 SRA's Proposal Volume I - Corporate Capability (AR Tab 18)

24 Contract No. W91QUZ-08-D-0005 - SRA (AR Tab 89)

25 SRA's Proposal Volume VI - Contract Proposal (Excerpts) (AR Tab 23)

26 SRA's Proposal Volume II - Performance Risk (Excerpts) (AR Tab 19)

27 Past Performance Questionnaires - SRA (Excerpts) (AR Tab 32)

28 SSEB Initial Consensus Evaluation Documents - SRA (AR Tab 36)

29 SRA's Proposal Volume V - Small Business Participation (AR Tab 22)

## I. PRELIMINARY STATEMENT

Plaintiff, L-3 Services, Inc. ("L-3") is protesting the awards of the Program Management Support Services 2 ("PMSS2") contracts (the "Contracts") to Systems Research and Applications Corporation ("SRAC"), Wyle Information Systems, LLC ("Wyle"), and Booz Allen Hamilton ("BAH") (collectively "the Awardees") under Solicitation No. W91QUZ-07-R-0007 (the "RFP" or the "Solicitation").[1] The United States Army Contracting Agency (the "Army") awarded the contracts on March 20, 2008.

These award decisions were arbitrary and capricious, an abuse of discretion and in violation of procurement law and regulation. First and foremost, the Army's decision [redacted] While the SSA attempted to [redacted] Even a cursory review of the SSDD demonstrates that the award decisions [redacted]

---

[1] SRA was awarded Contract No. W91QUZ-08-D-0005; Wyle was awarded Contract No. W91QUZ-08-D-0008; BAH was awarded Contract No. W91QUZ-08-D-0009.

[redacted] Thus, the SSDD does not [redacted]

To make matters worse, the errors in the award decision actually started lower than the SSA. The Army's evaluations of L-3 and the Awardees were flawed in one or more respects for [redacted] Each of these errors played a role in the SSA's award decision. Moreover, the Army failed to analyze properly the proposals [redacted] making the SSA's [redacted]

## II. STATEMENT OF THE QUESTIONS

1. Was the Army's decision to award the Contracts to SRAC, Wyle and BAH, arbitrary and capricious, an abuse of discretion, and violative of procurement law and regulation, given the Army's evaluation and decision errors?

2. Does the balance of harms weigh in favor of granting L-3's request for Preliminary and Permanent Injunctive and Declaratory Relief against the Army and Awardees commencing performance of the Contract prior to a decision on the merits of the protest?

3. Does the balance of harms weigh in favor of granting L-3's request for Preliminary and Permanent Injunctive and Declaratory Relief holding the Contract to be invalid and setting aside the awards and directing either that that Contract be awarded to L-3 or that the Army reevaluate the proposals submitted under the RFP?

## III. STATEMENT OF THE CASE

### A. The Parties and the Contract Awardee

Plaintiff, L-3 Services, Inc., is a wholly-owned subsidiary of L-3 Communications Corporation, with its headquarters at 1320 Braddock Place, Sixth Floor, Alexandria, VA 22314.

The Defendant is the United States of America, acting through the Department of the Army. The Awardees are SRAC, Wyle and BAH. Awards were also made to Binary Group and Savantage Solutions under a portion of the procurement reserved for small businesses. L-3 does not contest these small business awards.

### B. The PMSS2 Solicitation.

The Program Management Support Services II procurement is to acquire a range of Information Technology and related Program Management Support Services required by the Program Executive Office, Enterprise Information Systems ("PEO EIS") headquarters, directorates, program/project/product offices and the Office of the Army Chief Information Officer/G6 ("CIO/G6"). Exh. 1, AR Tab 4 (RFP) at § L.1. L-3 and another contractor, BearingPoint, are the incumbents on the current Program Management Support contract performing the same functions as those sought in the PMSS2 solicitation.

The Army intended to award five IDIQ contracts to the Offerors determined to be the most advantageous to the Government. Exh. 1, AR Tab 4 (RFP) at § M.2.1. Three of the awards would be made "without regard to the size of the Offeror" and two awards would be reserved for small businesses. *Id.* The Army reserved the right to make a third group of additional awards without regard to size, or to make more or less awards in each category. Id. Subsequent to award of the Contracts, all task orders were to be competed by the Army among the Awardees. Exh. 1, AR Tab 4 (RFP) at §G.11-12. The competition for future task orders will again require submission of new technical and cost proposals. *Id.*

Section M of the RFP established the evaluation criteria. The Offerors were to be evaluated on five factors: (1) Corporate Capability, (2) Performance Risk, (3) Technical/Management, (4) Price, and (5) Small Business Participation. Exh. 1, AR Tab 4 (RFP) at § M.3.1. In evaluating the factors, Corporate Capability was more important than Performance Risk, which was more important than Technical/Management. Technical/Management was more important than Price, which was more important than Small Business Participation. The non-price factors, collectively, were significantly more important than Price. EXH. 1, AR TAB 4 (RFP) AT § M.3.2.

The first factor, Corporate Capability had two subfactors: 1) Knowledge of and Experience with DoD/Army Acquisition Policies and Procedures; and 2) Performance Capability and Resources to Support PEO EIS and CIO/G6 Programs. *Id.* Of these subfactors, Knowledge of and Experience with DoD/Army Acquisition Policies and Procedures was more important than Performance Capabilities and Resources. Under the first Corporate Capability subfactor, the RFP directed the Army to evaluate Offerors on their "knowledge of and experience with DoD and Army Acquisition policies and processes such as the DoD 5000 series, information assurance, Independent Validation and Verification ("IV&V")," and DoD Information Technology Security Certification and Accreditation Process "in order to assess the Offeror's ability to manage and support information technology programs." EXH. 1, AR TAB 4 (RFP) AT § M.4.1.1.1. The second Corporate Capability subfactor required the Army to evaluate the Offeror's corporate capability to provide PM support for the nine areas in the Performance Work Statement and for the PEO EIS and CIO/G6 programs described. This evaluation included the Offeror's current corporate quality business processes and certifications to be used and the

Offeror's proposed qualified resources currently available. Exh. 1, AR TAB 4 (RFP) AT § M.4.1.2.1-M.4.1.2.3

The third factor, Technical/Management, also had two equally weighed subfactors: 1) Understanding the PM Support Required; and 2) Project Management Plan. *Id.* In evaluating the first subfactor of the third factor, Understanding of the PM Support Required, the Army was to evaluate the Offeror's overall program management approach to assess its understanding of the scope and support required for the PEO EIS and CIO/G6 programs. Exh. 1, AR TAB 4 (RFP) AT § M.4.3.1. Under the second subfactor for Technical/Management, the Army was to evaluate the Offeror's program management structure and tools to be used, its approach to identify, track, monitor, manage, and mitigate the risk associated with program management support, its methodology for recruitment, training and retention of qualified and security-cleared personnel, its approach to manage and coordinate its subcontractor efforts, and its proposed disincentives for the contract metrics in the Performance Work Statement. Exh. 1, AR Tab 4 (RFP) at § M.4.3.2.

Under Small Business Participation, the RFP directed the Army to evaluate the Offeror's approach to meeting or exceeding the Government's minimum mandatory requirement for overall Small Business participation and the non-mandatory objectives. These included an overall requirement of 20% small business participation and five non-mandatory objectives for Small Disadvantaged Businesses (6%), Woman-Owned Small Businesses (5%), Service-Disabled Veteran-Owned Small Businesses (3%), Veteran-Owned Small Businesses (3%), and Hub-Zone Small Businesses (1%). Exh. 1, AR Tab 4 (RFP) at §§ M.4.5.1 & M.4.5.2.

### C. Evaluation of Proposals.

The Source Selection Evaluation Board ("SSEB") evaluated the proposals using an adjectival rating system for all the factors except Price (Factor 4). Under Factors 1 and 3, Corporate Capability and Technical/Management, the ratings were as follows:

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Under Factor 2, Performance Risk, the ratings were:

[redacted]

Under Factor 5, Small Business Participation, the ratings were:

[redacted]

[redacted]

**1. Factor 1 – Corporate Capability.**

L-3 was [redacted] Under the first subfactor, Knowledge of and Experience with DoD/Army Policies and Processes, [redacted] under Subfactor 2, Performance Capability and Resources to Support PEO EIS and CIO/G-6 Programs [redacted] In comparison, [redacted] Under Subfactor 1, [redacted] Under Subfactor 2, [redacted]

[redacted] Wyle also [redacted] Corporate Capability. Under Subfactor 1, [redacted]

[2] Citations to the Agency Record refer to the record issued to L-3 on May 14, 2008 as part of GAO Bid Protest B-400055.

[redacted]

SRAC [redacted] Under Subfactor 1, [redacted] Under Subfactor 2, [redacted]

2. **Factor 2 - Performance Risk.**

Under Factor 2, Performance Risk [redacted]

3. **Factor 3 - Technical/Management.**

Under Factor 3, Technical/Management, L-3 [redacted] under Subfactor 1, Understanding of PM Support Required, [redacted] Under Subfactor 2, Program Management Plan, [redacted]

SRAC [redacted]

4. **Factor 5 - Small Business Participation.**

Under Factor 5, Small Business Participation, [redacted] *Id.* BAH was [redacted] BAH [redacted] Wyle was [redacted] SRAC [redacted]

5. **Summary of Evaluations and Prices.**

The following chart provides a summary of the SSEB's evaluations and the proposed prices of the L-3 and the Awardees. As shown in the chart [redacted]

| FACTOR/ SUBFACTOR | L-3 | BAH | SRAC | Wyle |
|---|---|---|---|---|
| 1. Corporate Capability | [redacted] | | | |
| Subfactor 1 | | | | |
| Subfactor 2 | | | | |
| 2. Performance Risk | | | | |
| 3. Technical Management | | | | |
| Subfactor 1 | | | | |
| Subfactor 2 | | | | |
| 4. Price | | | | |
| 5. Small Business Participation | | | | |

Exh. 2, AR Tab 84 (SSA Final Briefing) at 1st unnumbered page.

**D. The SSA's Source Selection Decision.**

Following the SSEB's final evaluations, the SSA made her source selection decision. The award decision resulted in award [redacted] In her SSDD, the SSA [redacted] In conducting this analysis, the SSA [redacted] At other times, [redacted]

---

3 As established below at Part at IV(3)(b)(ii) this rating [redacted]

4 As established below at Part IV(3)(b)(i) this rating [redacted]

[redacted] the SSA dove deeper under the ratings, [redacted] The SSDD resulted in awards to BAH, Wyle and SRAC.

**E. Award and Debriefing**

The Army awarded five IDIQ contracts in accordance with the RFP's minimum allotment as follows: Contract No. W91QUZ-08-D-0005 was awarded to SRAC; Contract No. W91QUZ-08-D-0006 was awarded to Savantage Solutions; Contract No. W91QUZ-08-D-0007 was awarded to Binary Group, Inc.; Contract No. W91QUZ-08-D-0008 was awarded to Wyle; and Contract No. W9 1 QUZ-08- D-0009 was awarded to BAH.

On March 20, 2008, the Army notified L-3 via letter that it was not selected for award. L-3 timely requested a debriefing on that same day. On April 8, 2008, the Army conducted a telephonic debriefing with L-3. During the debriefing, L-3 learned that [redacted]

The Army also stated that [redacted] Further, the Army stated that it [redacted]

### F. The GAO Protest

On April 14, 2008, L-3 timely filed its initial protest with the Government Accountability Office ("GAO"). The Army stayed performance pending resolution of the protest at GAO. 31 U.S.C. § 3553(d)(3); 48 C.F.R. § 33.104(c)(1).

On April 18, 2008, L-3 timely filed a supplemental protest with the Government Accountability Office, and on May 9, 2008, filed a second supplemental protest. On May 14, 2008, the Army submitted its first Agency report and produced a redacted version of the agency record. On May 27, 2008, L-3 filed its third supplemental protest based on the information disclosed in the agency record, as well as its comments on the Agency Report.

Before the Agency responded to L-3's third supplemental protest, the GAO dismissed the protest because a protest had been filed by Femme Comp. Inc at this Court. The automatic CICA stay was dissolved on the same date.

## IV. <u>ARGUMENT</u>

### A. Jurisdiction and Standard of Review

This Court reviews this protest under 28 U.S.C. § 1491(b)(1), which confers jurisdiction over "an action by an interested party objecting to ... any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). L-3, as an unsuccessful bidder, is an "interested party." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004) (holding that the term "interested party" in 28 U.S.C. § 1491(b) has the same meaning as that term is given in 31 U.S.C. § 3551 and thus includes "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract") (quoting *American Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). *See also* 31 U.S.C. § 3551(2)(A).

Judicial review in a protest is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). The APA standard of review requires a court to determine whether an agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court may not "substitute its judgment for that of the agency," *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), and may overturn an agency's decision only if "the procurement official's decision lacked a rational basis; or ... the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citing *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)). If a protestor succeeds in making these showings, the Court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

On a request for a preliminary injunction, the Court must weigh the following four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

**B. L-3 Likely Will Prevail On the Merits**

This Court should grant L-3's motion for a preliminary injunction because L-3 is likely to prevail in showing that the Army's contract award decisions were arbitrary and capricious, and not in accordance with the law.

**1. The Army's Best Value Tradeoff Was Inconsistent with the RFP's [redacted] and Reflected Disparate Treatment of L-3.**

It is fundamental that Offerors must be advised of the basis upon which their proposals will be evaluated. *See Isratex, Inc. v. United States*, 25 Cl.Ct. 223, 224 (1992), overturning an award decision because "[t]he request for proposals, however, did not indicate the relative importance of the characteristics involved, nor did it advise offerors that automatic exclusion would follow from the test failure". *See also The Faxon Co.*, B-227835.3, Nov. 2, 1987, 87-2 CPD ¶ 425 at 4 (finding that it is "fundamental that offerors should be advised of the basis upon which their proposals will be evaluated"). Thus, the Army was required both by statute and regulation to specify in the RFP "all significant factors and subfactors which the head of the agency expects to consider evaluating … competitive proposals" and to state the "relative importance assigned to each of those factors and subfactors." 10 U.S.C. §§ 2305(a)(2)(A)(i)-(ii); *see also* FAR 15.101-1(b)(1)-(2). Once stated, however, those factors and their "relative importance" may not simply be ignored by the agency. It must evaluate proposals "and make an award based solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1); *see also* FAR 15.305(a); *see, e.g., Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (citing 10 U.S.C. § 2305(b)(1) for the proposition that agencies must "evaluate ... proposals and make an award based solely on the factors specified in the solicitation."); *ProTech Corp.*, B-294818, Dec. 30, 2004, 2005 CPD ¶ 73 at 8 (finding a source selection

decision unreasonable when the SSA's tradeoff determination accorded a factor less weight than identified in the RFP).

In making a tradeoff between price and technical superiority in a best value procurement, an agency must apply the relative weighting of the evaluation factors specified by the RFP. *See, e.g., SOS Interpreting, Ltd.*, B-293026, Jan. 20, 2004, 2005 CPD ¶ 26 at 10-11 (sustaining protest where source selection decision was not reasonable or consistent with the solicitation's best value evaluation scheme). The requirements of a best value determination are not met where, [redacted] Rather, it must apply the relative weights specified in the RFP to assess whether [redacted]

[redacted]

This justification must be particularly strong when the agency [redacted]

[redacted]

Thus, the GAO has been critical of award decisions where, [redacted]

While the Source Selection Decision Document ("SSDD") [redacted]

The Army exacerbated that error (and perhaps sought to camouflage it) by engaging in disparate treatment that had the effect o[redacted] Disparate treatment of the nature exhibited by the Army in this procurement is improper. It is fundamental that an Agency treat all Offerors equally in order to provide a common basis for the preparation and the submission of proposals and not disparately evaluate Offerors with respect to the same requirements. *Isometrics, Inc. v. United States*, 5 Cl. Ct. 420 (1984) (where an unsuccessful Offeror was awarded a preliminary injunction concerning an Air Force procurement because of

unequal treatment of similarly situated Offerors); *Hamilton Sundstrand Power Sys. v. United States,* 75 Fed.Cl. 512, 516 (2007) (noting that "it is well-established ... that a 'contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria.'"), *See also BAE Technical Servs., Inc.*, B-296699, Oct. 5, 2005, 2005 CPD ¶ 91 at 5; *Lockheed Martin Info. Sys.*, B 292836, Dec. 18, 2003, 2003 CPD ¶ 230 at 11-12. This maxim is violated and the evaluation is unreasonable where one proposal is subject to stricter scrutiny than another. In *BAE Technical Services*, the GAO found the agency's evaluators had scrutinized the protestor's methodology more closely than the Awardee's. 2005 CPD ¶ 91 at 8-9. Though it was determined that the agency's concerns with the protester's proposal were reasonable, the mere fact that the agency had applied a more stringent standard to the protester's proposal was sufficient to sustain the protest:

> It appears to us that, while the agency viewed BAE's proposal with reasonable skepticism, it abandoned this skepticism in evaluating InDyne's proposal. This constituted application of different evaluation standards-one stricter than the other-to the two proposals, and was unreasonable.

*Id.* at 9. Similarly, in *Lockheed Martin Information Systems*, the GAO sustained a protest where the agency had applied an improper double standard. The GAO held: "We note, moreover, that the record reflects, overall, disparate treatment of the two firms, with the agency tending in general to apply a stricter standard in its evaluation of the LMIS proposal as compared to the EDS proposal." 2003 CPD ¶ 230 at 4.

As described in detail below, the Agency repeated the errors of *BAE Technical Services* and *Lockheed Martin Information Systems* here [redacted] Also, the SSA consistently

[redacted]

2. **The Army's Award Decisions** [redacted]

The PMSS2 RFP's evaluation criteria leave no room for interpretation. [redacted] Stating the converse, [redacted]

L-3 details below the way in which the SSA turned [redacted] But two general points will suffice to establish both [redacted] to the Army's selection decision, and the SSA's tendency [redacted] ***First***, it is striking that the [redacted] The following table, which was included in the GAO Agency Record and [redacted]

**TABLE 1: AWARDS WERE MADE TO THE THREE LOWEST-PRICE OFFERS.**

[redacted]

*Second*, although the SSA was careful to use [redacted] The departure [redacted] where the SSA justifies her selection of [redacted] Of course, the RFP [redacted]

5 [redacted]

[redacted]

Given this introduction, it is no surprise when the SSA later justifies her selection of [redacted] As these candid passages reveal, the SSA [redacted]

In the SSDD, the SSA justified her award decisions by [redacted] This strategy obscures whatever analysis was done [redacted] As shown below, the SSA failing to conduct a fair evaluation of the relative merits of each proposal, [redacted] Rather, the SSA [redacted] Further evidence of this is the SSA's [redacted]

a. <u>The SSA's Best Value Tradeoff Between L-3 and Wyle Does Not [redacted] and Reflects Disparate Treatment.</u>

The Army evaluated [redacted] but inexplicably failed to award the contract to L-3 [redacted] The decision to award to Wyle cannot be squared [redacted]

[redacted] In contrast, [redacted]

The following table summarizes the relative merits of the L-3 and Wyle proposals. It is obvious from this table alone that L-3 is the best value vis-à-vis Wyl[redacted]

[redacted]

**TABLE 2: L-3'S PROPOSAL IS MARKEDLY SUPERIOR TO WYLE'S.**

| FACTOR/ SUBFACTOR | WYLE/RSIS (PS) | | L-3 (PE) | |
|---|---|---|---|---|
| | RATING | STRENGTHS | RATING | STRENGTHS |
| 1. Corporate Capability | [redacted] | | | |
| Subfactor 1 | | | | |
| Subfactor 2 | | | | |
| 2. Performance Risk | | | | |
| 3. Technical Management | | | | |
| Subfactor 1 | | | | |
| Subfactor 2 | | | | |
| 4. Price | | | | |
| 5. Small Business Participation | | | | |

[redacted]

(i) *The SSA* [redacted] *Under Factor 1.*

As noted above, [redacted]

[6] As discussed, *infra*, this rating should be, at best, Fair.

[redacted] Moreover, the Army [redacted] In contrast, [redacted] Thus, the Army determined [redacted]

The SSA [redacted]

With respect to Subfactor 1, the SSA [redacted] Instead, the SSA [redacted] The SSA's [redacted]

Worse, the SSA's comparison of L-3 and Wyle [redacted]

*Id.* The SSA also found [redacted]

All in all, L-3 [redacted] Instead, the SSA chose to find that [redacted]

[redacted]

With respect to Subfactor 2, the SSA [redacted]

The conclusion is also flawed because [redacted] This disparate treatment renders the award unreasonable. *See, e.g., BAE Technical Servs., Inc.*, 2005 CPD ¶ 91 at 5-9. For example, the SSA [redacted] Again, when comparing L-3 to Wyle, the SSA [redacted]

[redacted]

In a last effort to justify her finding that [redacted]

[redacted][8]

Remarkably, even though [redacted]

---

7 L-3's [redacted]

8 Every assertion in this passage is supported by the record. [redacted]

[redacted] As demonstrated above, that finding is unsupported by the record and is plainly unreasonable.

(ii) *The SSA improperly* [redacted]

After dispatching Factor 2 ("Performance Risk") [redacted] the SSA moved on to Factor 3 ("Technical/Management"), [redacted]

Factor 3 consists of two equally weighted subfactors. Under Subfactor 1, the SSA properly found tha [redacted] This conclusion is unsurprising because [redacted] In contrast, [redacted]

Notwithstanding [redacted]

But, neither of [redacted] As the SSA acknowledges elsewhere, [redacted]

Similarly, [redacted] To summarize here briefly, [redacted] The disparate treatment inherent in the Army's [redacted]

[redacted]

[redacted] The SSA made this determination [redacted]

(iii) *The SSA* [redacted] *under Factor 5.*

The SSA acknowledged tha[redacted] under Factor 5 ("Small Business"), but concluded [redacted] That finding is unreasonable because [redacted] But, as explained in detail *infra,* Part IV.B.3.b.i, [redacted] In contrast, and as indicated by the Army's [redacted]

Even without [redacted] The SSA's assertion, [redacted] but is demonstrably false.

(iv) *The SSA's* [redacted] *underlies the unreasonable conclusion that Wyle offered better value than L-3.*

The SSA's flawed analysis and disparate treatment of L-3 culminates in this assertion:

[redacted]

The SSA's summary reflects the errors described above, [redacted] As corrected, the SSA's summary should have read as follows:

[redacted]

[redacted] In a similar situation, the GAO sustained a protest, holding [redacted]

b. <u>The SSA's Best Value Tradeoff Between L-3 and BAH [redacted] and Reflects Disparate Treatment.</u>

The SSA's [redacted] is also evident in the SSA's comparison of L-3 and BAH. The SSA improperly awarded a contract to BAH, and not to L-3, even though [redacted] Once again, the table below reveals [redacted]

**TABLE 3: L-3'S PROPOSAL IS MARKEDLY SUPERIOR TO BAH'S**

| FACTOR/ SUBFACTOR | BAH (PY) | | L-3 (PE) | |
|---|---|---|---|---|
| | RATINGS | STRENGTHS | RATINGS | STRENGTHS |
| 1. Corporate Capability | [redacted] | | | |
| Subfactor 1 | | | | |
| Subfactor 2 | | | | |
| 2. Performance Risk | | | | |
| 3. Technical/ Management | | | | |
| Subfactor 1 | | | | |
| Subfactor 2 | | | | |
| 4. Price | | | | |
| 5. Small Business Participation | | | | |

Exh. 2, AR Tab 84 (SSA Final Briefing) at 1st unnumbered page; Exh. 6, AR Tab 79 (L-3 Evaluation); Exh. 9, AR Tab 80 (BAH Evaluation).

Even a cursory review of the Agency Record establishes [redacted]

[9] As discussed, *infra*, this rating [redacted]

[redacted]

Given these facts, [redacted] it was unreasonable for the SSA to have decided [redacted] The SSA, however, again unreasonably [redacted]

(i) *The SSA* [redacted] *under Factor 1.*

For Factor 1 ("Corporate Capability"), [redacted]

Under Subfactor 1 [redacted] Nonetheless, without any further analysis or explanation, the SSA [redacted]

Under Subfactor 2, the SSA's sleight-of-hand went even further. Under this subfactor, [redacted]

Under these circumstances, [redacted]

The SSA [redacted]

[redacted]

The SSA's assertion that [redacted] That is not the law and cannot be the case, especially here [redacted]

10 [redacted]

[redacted]

(ii) *The SSA improperly* [redacted] *when assessing Factor 2.*

Under Factor 2 ("Performance Risk"), [redacted]

The Army's evaluators reported that [redacted]

(iii) *The SSA's mistaken analysis continued under Factor 3.*

Under Factor 3, [redacted] The SSA's comparisons are unreasonable and exude disparate treatment. *See BAE Technical Services, Inc.*, B-296699, Oct. 5, 2005, 2005 CPD ¶ 91 at 9 (sustaining a protest because the agency "abandoned its skepticism" when evaluating some Offerors). Her determinations for this factor are particularly striking because the SSA not only improperly compares the Offerors, but her comparison is based on the Army's faulty evaluation.

Under Subfactor 1, the SSA determined:

> [redacted]

[redacted] This conclusion simply ignores [redacted] Further, even the SSA [redacted] It is irrational, therefore, for the SSA to [redacted]

[redacted]

Under Subfactor 2, [redacted]

In all events, after her unsupported and disparate analysis, the SSA comes to the conclusion that [redacted] This conclusion, as the sum of its insufficient and flawed parts, is likewise unreasonable.

(iv) *Under Factor 5* [redacted]

Under the Small Business Participation factor, the quality of a proposal was in part to be evaluated [redacted]

In her analysis, however, the SSA focused [redacted]

[redacted] Worse, the SSEB made another rating error under this subfactor [redacted] *See* Part IV.B.3.b.ii., *infra*. Had the Army properly compared the proposals under the RFP's evaluation criteria [redacted]

(v) *The SSA's* [redacted] *underlies the unreasonable conclusion that* [redacted]

When the SSA made the final award decision between BAH and L-3, she stated:

[redacted]

[redacted]

The SSA's sleight of hand is remarkably blatant in the final comparison of Factors and Subfactors. [redacted]

Fourteen pages later, [redacted] this level of analysis is absent. In considering Factor Three [redacted]

c. The SSA Failed to Perform a Meaningful Review of L-3's Proposal.

As the Court may already have recognized, another flaw in the comparison of L-3's proposal with the awardees was the SSA's [redacted] This resulted in a failure to evaluate and compare L-3's proposal to the awardees in any meaningful way.

During a best value decision, an agency must adequately document its decision to establish that the decision was reasonable and consistent with the solicitation's stated evaluation criteria. The source selection decision must reflect that the SSA considered strengths and weaknesses of the proposals in relation to the solicitation's stated evaluation criteria.

FAR 15.608(a)(3); *see, e.g., Serco Inc. v. United States,* 81 Fed.Cl. 463, 498-9 (2008)("Of course, it is conceivable that the SSA, in his own mind, made such cost/benefit comparisons, but merely failed to capture them on paper. But, that too would violate the FAR and its documentation requirements. To comply with the FAR, documentation must 'include the rationale for any business judgments and tradeoffs made, including the benefits associated with additional costs'"); *Matrix Int'l Logistics Inc.*, 97-2 CPD ¶ 89 at 9 (SSA's analysis was unreasonable because "[t]here is no comparison of the relative merits of the competing proposals, and no explanation as to why the Sea-Land proposal was technically equivalent to the Matrix proposal with its greater number of 'excellent' ratings."). Importantly, while point scores assigned by the evaluators can provide guidance in resolving a cost/technical tradeoff, they do not alone substitute for reasoned analysis in reaching a source selection decision. *Met-Pro Corp.*, B-250706.2, Mar. 24, 1993, 93-1 CPD ¶ 263; *NUS Corp.; The Austin Co.*, B-221863; B-221863.2, June 20, 1986, 86-1 CPD ¶ 574.

While the SSA claimed she would perform a "factor-by-factor comparison of the successful Offerors with the unsuccessful offerors," Exh. 5, AR Tab 85 (Redacted SSDD) at 5, and the Contracting Officer believes that "the selection decision was not made based solely upon a comparison of colors ...." Exh. 11, AR Tab 2 (CO's Statement) at 2, in circumstance after circumstance where analysis of the proposals and of the detailed evaluation findings would have [redacted]

- [redacted]
- [redacted]

- [redacted]
- [redacted]
- [redacted]

In each case, there was no reasoned analysis, [redacted] Instead, the SSA substituted the evaluators' ratings for her own judgment in reaching a source selection decision. This was particularly prejudicia[redacted]

### 3. The Army's Evaluation of L-3 and the Awardees Was Arbitrary and Capricious, and Otherwise Contrary to Procurement Law.

The Army's underlying evaluations of L-3 and the awardees were flawed in multiple respects. Each and every one of these errors prejudicially affected the SSA's purported best value determinations to L-3's detriment. ***First***, [redacted] ***Second***, the Army's [redacted] ***Third***, the Army failed to [redacted] ***Fourth***, the Army improperly considered [redacted] ***Fifth***, the Army unresonably relied on and evaluated [redacted]

[redacted] Had the Army properly evaluated L-3 and the awardees, the SSA's best value decision could have resulted in a different award selection.

a. L-3 Should Have Received [redacted]

Under [redacted] L-3, [redacted] However, unlike the awardees, L-3 [redacted]

L-3's proposal [redacted]

This language is not markedly different from that in the other proposals,

- [redacted]

- [redacted]
- [redacted]

Thus, despite L-3 proposing [redacted] as the awardees had done, L-3 was [redacted]

b. The Army's Evaluations [redacted] under the Small Business Participation Factor Resulted in Inflated Ratings.

(i) [redacted]

Under the evaluation definitions, the best rating [redacted] under the Small Business Participation factor was in direct violation of the evaluation definitions.

Ratings for the Small Business Participation Factor were based on whether the Offeror exceeded the goals of the solicitation.

[redacted]

[redacted] It is clear from these definitions that [redacted] Consequently, [redacted]

**TABLE 4:** [redacted]

| CATEGORY | REQUIREMENT/ OBJECTIVES | [redacted] |
|---|---|---|
| Small Business (requirement) | 20% | |
| Small Disadvantaged Business (objective) | 6% | |
| Woman-Owned Small Business (objective) | 5% | |
| Service-Disabled Veteran-Owned Small Business (objective) | 3% | |
| Veteran Owned Small Business (objective) | 3% | |
| Hub-Zone Small Business (objective) | 1% | |
| HBCU/MI (objective) | Positive Goal | |

[redacted] The Army's own evaluators recognized that [redacted]

This error had a prejudicial effect on L-3 because it adversely affected the best value decision. If the proper rating had been assigned, and the SSA had properly recognized [redacted]

(ii) [redacted]

Yet another awardee, [redacted] given an inflated small business participation score that, under the RFP's evaluation scheme. As demonstrated by the chart below, the best rating [redacted] for Small Business Factor was [redacted] under the Small Business Participation factor was in direct violation of the evaluation definitions and is *per se* unreasonable.

Under the RFP, [redacted] on the other hand, simply did not.

TABLE 5: [redacted]

| CATEGORY | REQUIREMENT/ OBJECTIVES | [redacted] |
|---|---|---|
| Small Business (requirement) | 20% | |
| Small Disadvantaged Business (objective) | 6% | |
| Woman-Owned Small Business (objective) | **5%** | |
| Service-Disabled Veteran-Owned Small Business (objective) | **3%** | |
| Veteran Owned Small Business (objective) | **3%** | |
| Hub-Zone Small Business (objective) | **1%** | |
| HBCU/MI (objective) | Positive Goal | |

In fact, [redacted][12]

The SSEB's clear rating error is aggravated by the fact that the SSA, [redacted] Instead, the SSA focused [redacted]

---

[11] [redacted]

[12] This is also evidence that the Army consistently misevaluated the Small Business Participation [redacted]

In yet another instance of disparate treatment [redacted] If [redacted] the SSA would have [redacted]

c. <u>The Army's Failure [redacted] Is Fatal to the Army's Technical Evaluation.</u>

At L-3's debriefing, the Army acknowledged that its evaluation of the Offerors' proposal omitted a critical component: the Army made no effort whatsoever to determine: [redacted] The evaluations, in the absence of these [redacted] are arbitrary and capricious because they could not contain a meaningful evaluation of the relative merits of the Offerors' technical proposals or a [redacted]

(i) [redacted] *To Perform A Meaningful Evaluation Under The RFP's Technical Criteria.*

The RFP required the Army to evaluate the relative extent to which the Offerors could provide the resources necessary to support the PEO/EIS and the CIO/G-6 programs, RFP, §§ M.4.1.2 & 4.1.2.3, as well as the relative merits of their methodologies for "recruitment, training and retention of qualified and security-cleared personnel," *id.*, § 4.3.2.3. Of course, [redacted]

[redacted] Nonetheless, the Army acknowledged at L-3's debriefing that it [redacted]

The failure to [redacted] precluded a meaningful evaluation of the relative merits of the Offerors' technical offerings. Because it failed [redacted] the Army cannot know [redacted] And, the Army has no reason to be confident of its assessment of the Offerors' relative abilities to meet the [redacted]

L-3 was prejudiced by the Army's failure to perform the required crosswalks because [redacted] A proper evaluation would have determined [redacted] The Army's failure [redacted] That is, L-3 would have

been recognized as offering best value had the Army [redacted] Even if the Army's initial decision [redacted] was reasonable, that decision became patently unreasonable once the Army was on notice of the [redacted]

**TABLE 5:** [redacted]

[redacted]

[redacted]

The Army cannot justify its failure [redacted] because they were not specifically addressed in the RFP. [redacted]

[redacted] The RFP states: "The Government ***will evaluate*** the Offeror's ***proposed qualified resources*** currently available to include reach back capability to support task orders, as well as manage simultaneous task orders covering all nine (9) Functional Areas identified in the PWS." Exh. 1, AR Tab 4 (RFP) at § M.4.1.2.3 (emphases added). The Army could not have meaningfully performed such an evaluation without [redacted] They were ***not*** required to be identified separately in the RFP.

Similarly, the Army cannot dodge its responsibilities under the RFP by claiming the [redacted]

[redacted]

(ii) *The Army's Failure* [redacted] *also Precluded* [redacted]

In making her supposed best value award decisions, the SSA repeatedly relied on the fact [redacted] AR Tab 85 at 57, 65, 79. Indeed [redacted]

[redacted]

Here, the Army was precluded from making [redacted] because it: [redacted] In such circumstances, the Army's supposed best value determinations would impermissibly [redacted]

d. The Army's Technical Evaluation Improperly Considered Subcontractors, Notwithstanding the RFP's Express Limitation to Offerors."

The RFP repeatedly distinguished between the "Offerors" themselves and their full teams, including subcontractors. For example, Section M.4.2.1 states: "The Government will evaluate the Performance Risk Factor based on the quality and relevancy of *the Offeror's* past performance, as well as that of its proposed *major subcontractor(s)*." Exh. 1, AR Tab 4 (RFP) at § M.4.2.1; *see also id.* § 4.3.2.4. Formulations such as these made it clear to L-3 that, when the RFP referred to the evaluation of only "Offerors," *see, e.g.,* Exh. 1, AR Tab 4 (RFP) at §§ M.4.1.1.1 (Factor 1, Subfactor 1), M.4.1.2.1 (Factor 1, Subfactor 2); M.4.3 (Factor 3), it contemplated the evaluation of only the Offerors themselves and not their subcontractors.

Similarly, in an answer to a question about the RFP, the Army stated "*in the statement* 'The Offeror must be capable of performing ALL taskings listed under the nine Functional Areas

in the Performance Statement,' the term 'Offeror' refers to the combined contractor/subcontractor team." Exh. 1, AR Tab 4 (RFP), Section J, Att. 8, Q&A 18 (quoting RFP, § L.2) (emphasis added). The express limitation, "in the statement …," confirmed to L-3 that *in other provisions the term "Offeror" referred only to the Offeror itself.*

Indeed, it would be illogical to interpret "Offeror" as including subcontractors in RFP statements such as: (a) "The Government will evaluate *the Offeror's approach* to manage and coordinate *its subcontractor* efforts," Exh. 1, AR Tab 4 (RFP) at § M.4.3.2.4 (emphases added); or (b) The Government will evaluate the *Offeror's corporate capability* to provide [Program Management] support …," *id.*, § M.4.1.2.1 (emphasis added); *see* Initial Protest at 10. At L-3's debriefing, however, the Army confirmed that in each such instance it evaluated the entire proposed "team," and not merely the "Offeror" as required by the RFP.

L-3 was prejudiced by the Army's failure to limit the evaluation to the "Offeror," as required by the RFP, [redacted]

[redacted]

- [redacted]
- [redacted]

[redacted]

- [redacted]
- [redacted]
- [redacted]
- [redacted]
- [redacted]

[redacted]

[redacted]

- [redacted]
- [redacted]
- [redacted]

[redacted]

[redacted]

e. The Army Evaluated and Relied on [redacted]

The Army's evaluation was further flawed becaus[redacted]

It is a "well established principle that a parent corporation and a subsidiary are in law separate and distinct entities, and under ordinary circumstances a contract in terms and in name with one corporation cannot be treated as that of both, and a parent will not be liable for the obligations of its subsidiaries." *BLH, Inc. v. United States*, 13 Cl.Ct. 265, 272 (1987) (citations omitted); see also *Johnson Controls World Services, Inc. v. United States*, 44 Fed.Cl. 334, 342 (1999).

An Offeror can incorporate its parent or sister companies into its proposal, but it must actually commit the companies to meaningful involvement in performance of the contract:

> The relevant consideration is whether the resources of the parent or affiliated company – its workforce, management, facilities, or other resources - will be provided or relied upon, such that the parent or affiliate will have meaningful involvement in contract performance. ... Further, where, as here no provision in the solicitation precludes offerors from relying on the resources of their corporate parent or affiliated companies in performing the

> contract and if an offeror represents in its proposal that resources of a related company will be committed to the contract, the agency properly may consider those resources in evaluating the proposal.

*Hot Shot Express*, B-290482, 2002 CPD ¶ 139 at 3 (citations omitted). See also *Perini/Jones*, B-285906, 2002 CPD ¶ 68 at 6 (crediting Offeror with parent's corporate capability was unreasonable where it and the Offeror were separate legal entities and the former was not obligated to perform under the contract); *Gemmo Implanti SPA*, B-290427, 2002 CPD ¶ 146 (where the GAO found that crediting Offeror with affiliate's Corporate Capability was unreasonable despite the fact that the two entities shared two high-level management personnel where the affiliate's resources were not committed).

Here, [redacted]

13 [redacted]

[redacted]

For example, [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Moreover, L-3 has been prejudiced by this error. Given the closeness of the award decision, [redacted]

### C. L-3 Will Suffer Irreparable Harm.

If this Court does not grant the injunction to stay performance of the contract pending its final decision on the merits, L-3 will suffer irreparable harm. In this context, irreparable harm is measured by the consequences that will occur if performance is allowed to proceed notwithstanding the pending protest. *See PGBA, LLC v. United States*, 57 Fed.Cl. 655, 664 (2003). The relevant inquiry in assessing irreparable harm is "whether the protesters have an adequate remedy, in the absence of an injunction." *Information Sciences Corp. v. United States*, 73 Fed.Cl. 70, 127 (2006); *OTI America, Inc. v. United States*, 68 Fed. Cl. 646, 659 (2005) (quoting *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 221 (2004), *aff'd* 389 F.3d 1219 (2004); *Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 743 (2000)).

L-3 would suffer harm in its ability to compete for any PMSS2 task orders issued prior to the Court's decision as well as future PMSS2 task orders even if the Court were to eventually grant declaratory or injunctive relief and order submission of new proposals or a reevaluation. Clearly, L-3 would suffer great competitive harm if it was not allowed to compete for task orders that were solicited prior to the Court's final decision on this protest. Moreover, L-3's competitive interests will be harmed if the awardees are allowed to recruit L-3's current employees. L-3 not only would have difficulty performing its current task orders under the incumbent contract, but would be hindered in its ability to compete for the award of a contract (if

the court orders a re-evaluation of proposals) or for any task orders (if the court determines L-3 should be awarded a contract). L-3 interests in other government and commercial contracts would also be harmed by the loss of these key personnel.

Loss of valuable employees and loss of the ability to compete are both cognizable harms under the law. *See University Research Co. v. United States*, 65 Fed. Cl. 500, 513 (2005) (loss of valuable employees constitutes irreparable harm); *Transatlantic Lines LLC v. United States*, 68 Fed. Cl. 48, 56-57 (2005) (loss of ability to compete constitutes irreparable harm); *Seattle Sec. Servs. Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000) (same). In *University Research Co.*, this Court found irreparable harm supporting a preliminary injunction where "[the protester's] proposal was predicated on its ability to maintain the quality staff that were performing the incumbent contract, and this technical capability could be seriously impaired were the transition to continue and performance under the new contract to begin." 65 Fed. Cl. at 513. L-3's ability to compete and perform under the new contract would similarly be hindered by the loss of its employees to the current awardees.

**D. Any Purported Harm to the Army is Minimal.**

The harm to L-3 in the absence of an injunction pending a decision on the merits is clearly greater than any harm to the Government or any of the awardees. Indeed the Government would suffer no harm if an injunction were granted. Program management services will continue to be provided to the Government throughout the pendency of this protest pursuant to the incumbent contract.

The Awardees, as well, would not be harmed by a preliminary injunction. The Awardees have not begun any work under the Contracts, or any task orders. Therefore they would not incur any costs during the protest. Moreover, the awardees have no legitimate interest in a contract that was improperly awarded. *See e.g., Hawaiian Dredging Constr. Co. v. United*

*States*, 59 Fed. Cl. 305, 317 (2004) ("[I]n comparing the hardships of an injunction, the Government, Triton and Nova [the awardees] are not harmed by aborting a flawed award process"). In any event, as this Court has recognized, "an incumbent [such as L-3] is likely to suffer potentially greater injury than a new bidder for a contract ...." *University Research Co., LLC v. United States*, 65 Fed. Cl. 500, 514 (2005).

**E. Injunctive Relief is in the Public's Best Interests.**

The public has a strong interest in preserving the integrity of the procurement process by requiring the Government to follow its procurement laws and regulations. *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994); *Hospital Klean of Texas, Inc.*, 65 Fed. Cl. 618, 624 (2005) (granting temporary restraining order, in part, because of overriding public interest in prescribing integrity of procurement process by requiring the government to follow its regulations); *Metcalf Const. Co. v. United States*, 53 Fed. Cl. 617, 645 (2002) ("[P]laintiff has shown that granting a permanent injunction will serve the public interest by insuring that the solicitation is conducted in accordance with all federal procurement laws . . . . In granting plaintiff's prayer for relief, public confidence and competition in the federal procurement process will be preserved.") (citation omitted). *See also Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 572 (2000) ("It is beyond peradventure that the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid.").

Moreover, the public is not harmed by injunctive relieve because, as discussed above, the program management services called for by the contract will continue to be provided by the incumbent, L-3.

Accordingly, the court should grant L-3's request for a preliminary injunction.

**F. Security.**

Because the Army will suffer no cognizable damage as a result of the statutorily required relief that L-3 seeks herein, the court should not require a bond under Rule 65(c).

## V. Conclusion.

L-3 has (1) made a substantial showing that the Army's award decisions were arbitrary and capricious, an abuse of discretion, and violative of procurement law; (2) demonstrated that the balance of harms weighs in L-3's favor; and (3) established that granting a preliminary injunction serves the public interest. The Court, accordingly, should grant L-3's Motion for a Preliminary Injunction and require that the Army stay performance on all of the respective contracts until such time as the Court has made a judgment with regard to L-3's motion for Permanent Injunction and Declaratory Relief.

Dated: June 16, 2008

Respectfully submitted,

W. Jay DeVecchio

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
(202) 639-6893
(202) 637-6365 (fax)

Counsel for Plaintiff
L-3 Services, Inc.

Of Counsel:

Kevin C. Dwyer
Edward Jackson
Daniel E. Chudd
Damien C. Specht

JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001-4412

**Certificate of Service**

I hereby certify that I caused a copy L-3's Memorandum of Points and Authorities to be served this 16th day of June, 2008 by hand delivery as follows:

Kenneth David Woodrow
Civil Division, Commercial Litigation Branch
1100 L Street, NW, Suite 11030
Washington, D.C. 20530
(202) 353-0513 Telephone
(202) 514-7969 Facsimile

W. Jay DeVecchio